MAKAR, J.,
concurring in part, dissenting in part.
I concur with the majority, except as to the application of the Supreme Court’s decision in Miller v. Alabama,[3] which invalidated mandatory sentences of life without parole for juvenile offenders convicted of homicide offenses. In this “pipeline” case,[4] we are faced with the question of what lawful sentences may be imposed on juvenile offenders convicted of capital murder in light of Miller. In Washington v. State,[5] a panel of this Court did not address what sentencing options are legally available;[6] instead, the panel deemed a *1032 discussion on this topic to be premature and remanded for resentencing under Miller without further guidance.[7] While this minimalist approach has its appeal as an act of judicial restraint, and is a prudential limitation on this panel, the question of what sentencing options are available in Florida post -Miller is a purely legal issue that should be passed upon now and certified to the Florida Supreme Court:[8] the question is ripe and its prompt resolution is important to the administration of the judicial system in this class of pipeline cases.[9]
I.
In the wake of Miller, Florida faces a significant number of hearings to resen-tence juveniles convicted of murder who received mandatory life sentences without the possibility of parole. Since 1994, that sentence has been the only one available for juvenile offenders under section 775.082(1), Florida Statutes. Because Miller has now deemed it unconstitutional, the next sections briefly discuss the possible sentencing options. As discussed below, I would hold that the operative sentencing language of the 1993 version of section 775.082(1) is revived and juvenile offenders should be resentenced to life with the possibility of parole after 25 years; I would also certify a question to the Florida Supreme Court so that it might exercise its discretion to review the important sentencing issues presented de novo.
A. Statutory Revival
The State of Florida unequivocally advocates that only one constitutional sentencing option exists: revival of the 1993 version of section 775.082(1), Florida Statutes, which imposes a life sentence with the possibility of parole after 25 years (“life with parole-25”).[10] Resolution of the State’s legal position merits judicial attention now; indeed, it appears to be the clearest path that provides a definitive resolution most consistent with precedent and separation of powers principles.
*1033 The concept of judicial revival, though infrequently used, is well-grounded in federal and Florida precedents. It is based in large measure on separation of powers principles akin to those applied when courts determine whether invalid portions of legislation are severable. See Fla. Dep’t of State, Div. of Elections v. Martin, 916 So.2d 763, 773 (Fla.2005)(“ ‘Severability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions.’ The doctrine of severability is ‘derived from the respect of the judiciary for the separation of powers, and is designed to show great deference to the legislative prerogative to enact laws.” ’)(internal citations and quotations omitted). Revival is a close cousin of severability: when the judicial branch invalidates an act of the legislature, the prior statute is brought back to life to avoid an unintended gap in the law. Citing Supreme Court precedent, the Sixth Circuit summarized the concept as follows:
It has long been held that a statute which is unconstitutional does not repeal a prior statute on the subject when a contrary construction would create a void in the law which the legislative body did not intend. The prior statute is “revived” to avoid a chaotic hiatus in the law.
White Motor Corp. v. Citibank, N.A., 704 F.2d 254, 261 (6th Cir.1983) (citing Frost v. Corp. Comm’n, 278 U.S. 515, 526-27, 49 S.Ct. 235, 73 L.Ed. 483 (1929) (prior version of statute, which “expressed the will of the Legislature” that enacted it, “must stand as the only valid expression of the legislative intent” when its subsequent amendment is deemed unconstitutional)). Likewise, the Florida Supreme Court has judicially “revived” statutes whose successors were held invalid. For example, in the election law context, the supreme court held that the “repealed sections of the statute are hereby revived and shall remain in force and effect to provide a procedure for write-in candidacies in future elections until properly changed by the legislature.” Smith v. Smathers, 372 So.2d 427, 429 (Fla.1979).
In the criminal law context, the most recent and pertinent Florida Supreme Court case on statutory revival is B.H. v. State, 645 So.2d 987 (Fla.1994), which stated:
Florida law has long held that, when the legislature approves unconstitutional statutory language and simultaneously repeals its predecessor, then the judicial act of striking the new statutory language automatically revives the predecessor unless it, too, would be unconstitutional.5 As courts in other states have noted, this rule generally is applicable only where the loss of the invalid statutory language will result in a “hiatus” in the law that would be intolerable to society.
Id. at 995 (text of footnote 5 and internal citations omitted).[11] This language pro *1034 vides a mechanism for filling an intolerable gap in the law by reverting to prior statutory language; the judicial inquiry focuses on what language was repealed to make room for the new, albeit-unconstitutional, language.
Application of this approach in B.H. resulted in the revival of statutory language in the juvenile escape statute that “fully and clearly” defined the crime at issue without the unconstitutional delegation of authority that “unwittingly” made its way into the successor statute. Id. at 996. Having decided the case on this basis, the supreme court — in dicta — -stated in footnote 5:
This necessarily means that there cannot be a revival of any statute other than the immediate predecessor. If the immediate predecessor statute is defective, then no further revival is possible under any circumstances. There also may be cases in which the immediate predecessor statute was enacted so long ago in the past that it no longer reflects the consensus of society and therefore should not be revived.
Id. at 995 n. 5. It is dicta because it was unnecessary to decide the case; indeed, the court concluded this footnote by saying the stated circumstances were “not the case before us today.” Id. Nevertheless, footnote five is persuasive dicta that cannot simply be ignored; it has its own West Headnote and a few courts have cited it.
This said, the question is whether statutory revival is available to fill the gap that would otherwise exist in light of Miller, one that would be intolerable due to the lack of a penalty for the commission of first-degree murder by a juvenile. The statutory language making the sentence for Partlow’s first-degree murder conviction a mandatory one has been in section 775.082(1) since 1994 when the legislature enacted Chapter 94-228:
(1) A person who has been convicted of a capital felony shall be punished by death if life imprisonment and shall be required to serve- no less-than-twenfy-five (25) years-before becoming eligible for parole unless the proceeding held to determine sentence according to the procedure set forth in section 921.141 results in findings by the court that such person shall be punished by death, otherwise such person shall be punished by life imprisonment and :

(a) if convicted of murder in the first degree or of a capital felony under s. 791.161, shall be ineligible for parole, or

(b) if convicted of any other capital felony, shall be required to serve no less than 25 years before becoming eligible for parole in-the-latter event such person shall be^ punished by death.
Ch. 94-228, § 1, Laws of Fla. (effective May 25, 1994). As the stricken portion indicates, prior to the 1994 adoption of a mandatory life without parole sentence for first-degree murder, a person convicted of that crime was to be punished “by life imprisonment and [was] required to serve no less than twenty-five (25) years before becoming eligible for parole[.]” This is the portion of the statutory language the State advocates is revived due to Miller.
*1035 The only change to 775.082(1) since 1994 was in 1995 when the legislature modified subsection 1 as follows:
(1) A person who has been convicted of a capital felony shall be punished by death if the proceeding held to determine sentence according to the procedure set forth in section 921.141 results in findings by the court that such person shall be punished by death, otherwise such person shall be punished by life imprisonment anck
(a) if convicted of- murder in the first degree or-of-a.capital felony -under- s. 791.161, shall be ineligible for parole,-©?
(b) if convicted of any other capital felony,-shall-be-?equired46-sepve-no-less than-25-year-s-before-becoming-eligible for parole.
Ch. 95-294, § 4, Laws of Fla. (effective Oct. 1, 1995). This revision to section 775,082(1) made no change to the statutory sentence for persons convicted of murder in the first degree: life imprisonment without parole. What changed is that the legislature made all capital felonies subject to life imprisonment without parole. Because this change left the penalty for first-degree murder entirely unchanged, it is difficult to see its applicability in statutory revival analysis.
Indeed, revival of the 1994 language does no injustice to the dicta in B.H. The concerns in footnote five of B.H. are twofold. The first is that revival can reach no “statute other than the immediate predecessor.” This form of “horizontal” statutory revival is based on the legal fiction[12] that the legislature would have preferred application of the language in the predecessor statute had it known its revisions to it would be deemed unconstitutional.[13] As *1036 a matter of judicial prudence, footnote five draws the line at the immediately preceding version of the statute.[14]
But can the “immediate predecessor” be a version of the statute that left the relevant criminal penalty unchanged? In this regard, one could technically view the “immediate” predecessor to section 775.082(1) to be the statute as it read before the 1995 revision. But that would ignore that the amendment in 1995 did nothing to change the sentence for persons convicted of first-degree murder; it merely expanded that sentence’s reach from just first-degree murder convictions to all capital felony convictions. Thus, the relevant portion of section 775.082(1) at issue in this first-degree murder case is the repeal and replacement of life with parole-25 with mandatory life in 1994. See State ex rel. Boyd v. Green, 355 So.2d 789, 795 (Fla.1978)(“Where a repealing act is adjudged unconstitutional, the statute (or in this case the rule) it attempts to repeal remains in force.”). Under these circumstances, where no change in the statutory penalty occurred in 1995, the dicta in footnote five should not be inflexibly applied to preclude revival of the life with parole-25 sentence, which was the predecessor penalty in section 775.082(1). For these reasons, the 1995 language poses no hurdle for statutory revival purposes.
Next, would revival of this pre-1994 sentencing option be so disconnected from today’s world as to be out-of-sync with contemporary norms? I think not. A second concern in B.H. is whether the passage of time has undermined society’s possible acceptance of the revived remedy. The main concern with revival of a criminal statute that no longer reflects societal consensus (or that is beyond the “immediate predecessor” statute), at least in the criminal context, is rooted in due process concerns, which are not present when the revived statute merely imposes a lesser sentence. Further, eighteen years have passed since the life with parole-25 sentence for first-degree murder was abolished in 1994. This period is not so remote in time that revival of the predecessor sentence would “no longer re-flecte] the consensus of society.” B.H., 645 So.2d at 995 n. 5. Indeed, the State currently has an operative parole system in place for offenders convicted under the predecessor versions of this statute. That the State of Florida vigorously defends revival is a significant factor to consider in evaluating societal acceptance.
It is argued that revival of the predecessor penalty would require the legislature to expand the parole board’s responsibility to cover such cases, thereby raising separation of powers issues. This point is legitimate, but tellingly the State sees it as no impediment on this basis. Because the parole board is already in place — and actually handles active cases under the predecessor statute today — reviving the predecessor statute requires no legislative action. Instead, sentencing in these cases would revert to the sentencing structure that continues to operate for a large number of Florida inmates.
*1037 That revival might create a “hybrid” type of statutory scheme does not preclude such a result. The “propriety of such a ‘hybrid’ statute, containing elements taken from two different legislative schemes adopted in different years, raises a question of state law.” Waldrup v. Dugger, 562 So.2d 687, 693 (Fla.1990). For obvious reasons, “courts should disfavor creating a hybrid statute comprised of parts taken from both present-day and superseded enactments. Such an action interjects the judiciary into a realm of policy considerations that properly belongs to the legislature.” Id. at 693 n. 16. But the Florida Supreme Court did so in Waldrup, in large measure, because it was “requested to do so by the administrative agency entrusted by the legislature to oversee and administer the particular statutes now under review.” Id. (noting that agency had apparent authority to “waive any objection the state otherwise might raise regarding the creation of a hybrid statute of the type suggested here”). In contrast to Waldrup, where a state agency advocated for the statutory scheme, it is the State of Florida itself in this case that seeks revival of the life with parole-25 sentence, thereby minimizing concerns that the judiciary is injecting itself in legislative policy-making.
Another objection is that revival would result in one-size-fíts-all sentences of life with parole-25, which contrasts with Miller’s individual-centric approach to sentencing juveniles. But, it must be kept in mind that Miller involved juveniles facing mandatory life sentences without the possibility of parole. A life with parole-25 sentence is quantitatively and qualitatively a far different sentence from mandatory life without parole, the strongest of all available punishments for juveniles. Fairly read, Miller does not require individualized sentencing of juveniles for anything other than sentences of life without parole.
One of the major points discussed in the Public Defender’s supplemental brief in Washington, is that remand will allow -for the presentation of evidence of “how persons who have served 25 years on life sentences for murders committed when they were under 18 have faired [sic] in parole proceedings. Ample data should exist.” It is an interesting point, but as we have seen in Graham and Miller, this type of data is routinely presented in appellate proceedings, even if not entered formally into the record at the trial level; delaying the Florida Supreme Court’s discretionary review on this basis is not persuasive. Moreover, it is unclear why data on life with parole-25 sentences is important under Miller, a decision that only addressed the constitutionality of mandatory life sentences without the possibility of parole.
The Public Defender’s brief also argues against life with parole-25 sentences because, in its view, the parole system in Florida is inadequate — indeed unconstitutional — as applied to juvenile offenders because it “largely disregards many of the mitigating circumstances of youth and gives negligible consideration to the offender’s gains and maturity and rehabilitation.” If this Court were to hold, as the Public Defender claims, that parole in Florida is unconstitutional as applied to juvenile offenders, it would amount to a far greater intrusion under separation of powers principles and effectively eliminate all sentencing options that include parole. The adequacy of the parole system in Florida, as applied to juvenile offenders, is simply not at issue in this class of cases.
Finally, a core concern with statutory revival in B.H. is not implicated here. In B.H., the statute at issue defined the elements of a crime; revival of the prior version risked criminalizing activity that may not have been prohibited by the invalid statute. Here, the elements of a crime *1038 are not at issue; it is only the punishment for the crime of murder — an act that has always been prohibited. Further, due process concerns are not implicated because the defendant will necessarily benefit from a reduced sentence: life with the possibility of parole is less severe than life without the possibility of parole.
B. Other Remedial Options[15]

Term of Years With/Without Parole

Notably, the Public Defender in its initial brief requested that “Appellant’s life sentence without parole on [the first-degree murder conviction] should be vacated and the case remanded with directions that he be sentenced to life in prison with a possibility of parole after twenty-five years.” The Public Defender has changed course after Miller and now argues for a term of years with immediate parole; Judge Wolf urges a term of years without parole. The former would require a substantial intrusion into separation of powers by judicially creating a remedy that has never existed in Florida over the past century for first-degree murders. The latter has much appeal because it hews closely to two principles upon which the current mandatory life without parole sentence is based: (1) no parole, and (2) potentially long terms of incarceration. A term of years without parole, however, has never been a legislatively authorized sentence in Florida for first-degree murder. Admittedly, it is a pragmatic problem-solving approach, but it also envisions the imposition of an individualized sentencing process in light of Miller (discussed in the next section), which — without further legislative direction — should be limited to only where the State seeks a life without parole sentence.

Life Without Parole After Youth-Mitigation Hearing

The panel in Washington suggests that the State can seek a life without parole sentence on remand, a “constitutionally permissible sentencing option,” provided it conducts “an individualized examination of mitigating circumstances in considering the fairness of imposing such a sentence.” Washington, 103 So.3d at 920. The State opposes this option as unauthorized and illegal under Florida’s current statutory structure. The State is correct that the legislature has not authorized such a discretionary sentence; it currently authorizes only a mandatory sentence. Even assuming the legislature would agree to discretionary life sentences, it is wholly indeterminate what youth-mitigation process the trial courts are to follow to comply with Miller. In Florida, not a single statute, court rule, or other guidepost exists that directly addresses this process; it will have to be created from whole cloth on remand.
Moreover, if a discretionary life without parole sentence were available under Florida law, it makes more sense to certify a question to the Florida Supreme Court to confirm this legal conclusion and simultaneously seek guidance — for the benefit of trial courts statewide — on what youth-mitigation process is required. Absent review by the supreme court now, the many re-sentencing hearings to be held in Florida over the coming months and years may well be for naught; a second round of resentencing hearings will be required un *1039 less trial courts have followed the same sentencing path that our high court eventually validates. Establishing uniformity in sentencing options now will eliminate uncertainty; delaying resolution of the inevitable does the opposite.
Notably, if the State chooses to pursue a life without parole sentence and is unsuccessful, the trial court is back to square one and must decide what other sentencing options exist — for which it is provided no direction. Even if life without parole is an available punishment, the State may decide not to pursue it; after all, the United States Supreme Court has said it expects this punishment will be “uncommon” in practice, inferring that lesser punishment levels will be the norm. Miller, 132 S.Ct. at 2469 (“[W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.”). The State might also decide it is too costly to conduct potentially burdensome youth-mitigation hearings in these cases; mitigation litigation is expensive, in part, because of the cost of reports and testimony of experts and other professionals (as well as testimony and evidence of the families of the defendant and that of the victims and their families). All in all, the uncertainties and costs of seeking life sentences without parole for juveniles could be so significant that prosecutors would prefer to pursue another sentence; but, if they choose to do so, they need to know their options — as do the persons convicted of or currently facing first-degree murder charges.
II.
In summary, I concur that the trial court did not err in denying Appellant’s motion to suppress. I also agree that resentencing on the first-degree murder conviction is required under Miller v. Alabama. The State of Florida seeks revival of the statutory sentence previously available for those who commit first-degree murder: life with eligibility for parole after 25 years of incarceration. I would hold that the Supreme Court’s decision in Miller operates to revive this predecessor remedy under Florida law, but certify a question of great public importance for the Florida Supreme Court’s consideration.[16] In doing so, I would urge the court to accept jurisdiction in light of the pure legal issues presented and the need to give defendants, prosecutors, public defenders, and trial judges the guidance necessary to conduct sentencing and resentencing of juveniles who have committed first-degree murder.

. -U.S.-, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).

. Juveniles whose cases were not final on appeal prior to Miller's release will be entitled to the benefits of that decision. Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); Wuornos v. State, 644 So.2d 1000, 1007 n. 4 (Fla.1994); Smith v. State, 598 So.2d 1063, 1066 (Fla.1992).

. 103 So.3d 917 (Fla. 1st DCA 2012).

. Judge Wolf, in his concurrence in Washington, agreed to a remand in light of Miller but disagreed with the panel’s decision not to pass upon what sentencing options are available. Washington, 103 So.3d 917 (Wolf, J., *1032 concurring). He disagreed with the sentencing options advocated by the State (statutory revival) and the public defender (term of years with immediate parole), stating the most appropriate sentencing option would be a term of years without the possibility of parole. Id.

. To the extent a legislative solution exists, it faces hurdles including the state constitutional constraint that the "[r]epeal or amendment of a criminal statute shall not affect prosecution or punishment for any crime previously committed.” Art. X, § 9, Fla. Const.; see Smiley v. State, 966 So.2d 330 (Fla.2007); State v. Watts, 558 So.2d 994 (Fla.1990).

. The State of Florida asked this Court to certify questions in its post-decision motion in Washington, which was denied.

. This issue is of pressing concern for two additional reasons. First, Florida faces a significant number of pending and prospective prosecutions of juveniles under this statute for which resolution of these legal issues is of substantial importance. Based on statistics published by the Department of Corrections, as many as fifty-five juveniles per year are sentenced to life without the possibility of parole for homicide offenses. As long as the issue remains unresolved, the number of cases resolved after Miller (and to which any new sentencing scheme is applicable) will only continue to grow. Second, whether juvenile offenders whose cases were final before Miller was issued will be entitled to its benefits depends on whether Miller has retroactive effect, an issue currently of some debate. See Gonzalez v. State, 101 So.3d 886 (Fla. 1st DCA 2012) (rejecting retroactive application of Miller), Geter v. State, 115 So.3d 375 (Fla. 3d DCA 2012) (same). If Miller is ultimately deemed retroactive, the number of post-conviction cases in Florida will increase significantly.

.Nota bene that this sentence is not the sentence at issue in Miller (more later). Also note that the Public Defender advocated this, and only this, sentence in its initial brief, but has changed its position (also more later).

. The vitality of this portion of the opinion is not without doubt. A majority of justices concurred in that portion of the plurality opinion discussing principles of statutory revival (Justices Grimes, Wells, McDonald and Overton). Only two justices, however, explicitly agreed with it (Justices Grimes and Wells). Two others agreed that statutory revival would apply if the challenged statute were unconstitutional; but it was not in their view (Justices McDonald and Overton). Further clouding the matter. Justice McDonald's opinion stated it was a concurrence "in result only.” B.H., 645 So.2d at 997 (McDonald, X, concurring in result only). This type of concurrence typically does not create precedent. Gerald Kogan & Robert Craig Waters, The Operation and Jurisdiction of the Florida Supreme Court, 18 Nova L.Rev. 1151, 1175 (1994) ("There may be cases in which a jus *1034 tice writes a ‘concurring in result only' opinion that also appears to agree with more than just the result. However, it seems doubtful that such an action could constitute the fourth vote needed to give the opinion validity as precedent.”). Three justices dissented, stating that statutory revival did not apply or violated due process (Justices Kogan, Harding, and Shaw). B.H., 645 So.2d at 997 (Kogan, J., dissenting). As a consequence, the fractured decision in B.H. answers some questions but leaves others open for further review and refinement in the context of the present case.

. See Lon L. Fuller, Legal Fictions (1967)(categorizing the many types of fictions used in the development of the law, such as the presumption that everyone knows the law and that corporations are people).

. The concept of "vertical” revival, that a court may remand for resentencing on uncharged lesser included offenses under a criminal code, is a controversial one that currently divides state and federal courts. See State v. LaFleur, 307 Conn. 115, 51 A.3d 1048, 1069 (2012)("[C]ourts are divided between those that have a bright line rule precluding modification, and those that make a case-by-case determination based upon fairness.”). The court in LaFleur noted:
there is a distinct split of authority on this question among both state and federal courts. Some courts have held that it is appropriate for an appellate court to order the modification of a judgment to reflect a conviction of a lesser included offense, even in the absence of a jury instruction on that lesser offense, when it is not unfair to the defendant to do so.... Other courts have barred such a modification unless the jury has been instructed on the lesser included offense.
Id. at 1068 n. 27 (quoting State v. Sanseverino, 291 Conn. 574, 969 A.2d 710, 720-21 (2009)(compíling cases)(case citations, paren-theticals, and footnote omitted)); see also Shields v. State, 722 So.2d 584, 586 (Miss.1998)("Other courts have had difficulty with this issue as well and have taken a variety of positions.”) (compiling and discussing federal and state cases). Federal courts uniformly allow for resentencing on lesser included offenses, but are divided on whether they must be charged or may be uncharged. Compare United States v. Hunt, 129 F.3d 739, 746 (5th Cir.1997)(remanding for entry of judgment on uncharged lesser included offense where "the lack of instruction on the lesser included offense was not unduly prejudicial” to the defendant) with United States v. Dinkane, 17 F.3d 1192, 1198 (9th Cir.1994)(requiring that jury be instructed on the lesser-included offense). In Florida, we have a statute that states:
When the appellate court determines that the evidence does not prove the offense for which the defendant was found guilty but does establish guilt of a lesser statutory degree of the offense or a lesser offense necessarily included in the offense charged, the appellate court shall reverse the judgment and direct the trial court to enter judgment for the lesser degree of the offense or for the lesser included offense. *1036 § 924.34, Fla. Stat. (2012). The statute has been applied to first-degree murder cases, Hines v. State, 227 So.2d 334 (Fla. 1st DCA 1969), and to an uncharged lesser offense, Shaara v. State, 581 So.2d 1339 (Fla. 1st DCA 1991), but has been recently narrowed significantly on constitutional grounds, see State v. Sigler, 967 So.2d 835 (Fla.2007).

. The limitation to only the predecessor statute is somewhat artificial because, arguably, the legislature would prefer any prior statutory penalty scheme that is deemed constitutional to the alternative of having no penalty statute at all, provided due process concerns are met.

. This section reviews only those remedial options discussed in this case and Washington; others may exist. Revival of the common law punishment for first-degree murder — death'—is not an option and is not discussed. See Cook v. State, 46 Fla. 20, 35 So. 665, 677 (1903)(noting that “the common-law definition of murder, classing the most atrocious under murder in the first degree” for "which the death penalty is inflicted”).

. I would certify the question as "Whether the Supreme Court’s decision in Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), which invalidated section 775.082(1)’s mandatory imposition of life without parole sentences for juveniles convicted of first-degree murder, operates to revive the prior sentence of life with parole eligibility after 25 years previously contained in that statute?” This question, of course, would not limit our supreme court's review of any of the proposed sentencing alternatives if discretionary jurisdiction is accepted.